CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
05/26/2020
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

(Charlottesville Division)

| | |
|---|---|
| ANTIGONE GRANT )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>) Civ. No:   3:20-cv-00026<br>ALBEMARLE COUNTY OFFICE )<br>OF HOUSING )<br>)<br>    Defendant. )<br>) | |

## COMPLAINT

## INTRODUCTION

1.      Plaintiff ANTIGONE GRANT brings this action against her Housing Choice Voucher administrator, ALBEMARLE COUNTY OFFICE OF HOUSING for violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.; procedural due process under the Fourteenth Amendment of the United States Constitution, and substantive due process under the Fourteenth Amendment of the United States Constitution through their improper termination of her Housing Choice Voucher.  As more fully set forth below, Ms. Grant held a Section 8 Housing Choice Voucher through Albemarle County Office of Housing ("ACOH"), which she has been using to afford safe and suitable housing for her family.

2.      Defendant ACOH sought to terminate Ms. Grant's Voucher on January 30, 2020, effective February 29, 2020.

3.      Ms. Grant challenged ACOH's termination of the Voucher at an informal hearing on March 10, 2020; ACOH's hearing officer later upheld the termination.

4.     The hearing officer's ruling was legally defective, however, and ACOH's termination of Ms. Grant's Voucher was improper because:

a.     The hearing officer's decision failed to adequately consider whether Ms. Grant should have been giving a reasonable accommodation under the Fair Housing Act that would have enabled her to comply with her program obligations despite her disabilities;

b.     The hearing officer's decision relied on allegations not presented in ACOH's January 30, 2020, termination notice;

c.     The hearing officer failed to consider any of the mitigating circumstances surrounding Ms. Grant's case;

d.     The hearing officer had improper ex parte communications in violation of Ms. Grant's due process right to an impartial decision-maker; and

e.     The hearing officer misapplied the Violence Against Women Act (VAWA). 34 U.S.C. § 12491; 24 C.F.R. § 5.2005(b)(1).

5.     ACOH's final decision therefore was not in accordance with law, and ACOH's termination of Ms. Grant's Voucher on the basis of this decision is a wrongful act outside the lawful jurisdiction of ACOH.

## JURISDICTION AND VENUE

6.     The Court has personal jurisdiction over Albemarle County Office of Housing because 1) it is domiciled in Virginia; 2) it transacts business in Virginia, and 3) its acts and omissions in Virginia gave rise to Plaintiff's claims.

7.     This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), because the action arises under 42 U.S.C. § 1983 and 42 U.S.C. § 3601 *et*

*seq.* (the Fair Housing Act), and the Fourteenth Amendment of the United States Constitution. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to decide the claim raised under Va. Code § 36-96.1 *et seq.* (the Virginia Fair Housing Act).

8.      This action also brings claims for declaratory judgment and attorney's fees, over which this Court has jurisdiction pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 1988.

9.      Venue and division are proper in this Court pursuant to 28 U.S.C. § 1391 and Local Rule 2(a)(3) as the judicial district and division in which all relevant events and omissions occurred and in which Defendant maintains offices.

## PARTIES

10.     Plaintiff Antigone Grant is an adult resident of Louisa County, Virginia.

11.     The Albemarle County Office of Housing is a department of Albemarle County, a Virginia County. ACOH is a Public Housing Agency (PHA) as defined 42 U.S.C. § 1437a(b)(6) and operates to increase opportunities for all Albemarle County citizens to secure and maintain decent, safe, sanitary, accessible and affordable housing with special emphasis given to those citizens least able to obtain it.

## LEGAL BACKGROUND

12.     The Section 8 Housing Choice Voucher program ("HCV") is a federally-funded program through the Department of Housing and Urban Development that provides residential rent subsidies to low-income families to choose suitable housing units in the private market. *See* 24 C.F.R. § 982.1 *et seq*; 42 U.S.C. § 1437f(o).

13.     HUD administers the HCV program by contracting with local PHAs, which in turn issue HCVs to individual families.

14.     A family awarded a HCV must locate a suitable rental property with a private landlord willing to enter into a Section 8 Voucher "Housing Assistance Payments" Contract (HAP Contract).

15.     Once an appropriate property and landlord are found, the family enters into a rental agreement with the landlord, typically committing to pay about thirty percent (30%) of the family's income in rent, while the PHA simultaneously promises to pay the difference between the family's portion of the rent and the market rent during the Housing Assistance Payment (HAP) Contract period.

16.     A PHA's administration of the HCV program is governed by the U.S. Constitution and the Virginia State Constitution, applicable federal statutes (including the Fair Housing Act and the Violence Against Women Reauthorization Act of 2013 (VAWA)), HUD regulations (primarily codified at 24 C.F.R. part 982), and the PHA's own Administrative Plan.

17.     A family has a constitutionally protected property interest under the Fourteenth Amendment in retaining their HCV. A PHA cannot terminate or revoke the voucher except in accordance with due process of law. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

18.     The grounds upon which a PHA may terminate an HCV are limited to 24 C.F.R. §§ 982.552-553.

19.     The PHA has the discretion under 24 C.F.R. § 982.552(c) to terminate an HCV for a violation of a "family obligation" as defined in 24 C.F.R. § 982.551(c)(1)(i).

20.     The PHA's discretion to terminate an HCV is further limited by the requirements set forth in the Fair Housing Act and VAWA. *See* 24 C.F.R. § 982.552(c)(2)(v).

21.    For instance, VAWA prohibits a PHA from terminating a tenant's HCV, if the termination is "a direct result of the fact that the . . . tenant is or has been a victim of domestic violence." 24 C.F.R. § 5.2005(b)(1).

22.    This includes terminating based on an adverse factor, which according to HUD can include factors as far-reaching as poor credit history or even non-payment of rent, if the non-payment can be traced to the abuse.  Dep't of Hous. and Urban Dev, Notice PIH-2017-08 (HA) Violence Against Women Reauthorization Act of 2013 Guidance, May 19, 2017, p. 6-8, https://www.hud.gov/sites/documents/PIH-2017-08VAWRA2013.PDF.

23.    In accordance with due process, the PHA must provide timely and adequate notice detailing the legal and factual basis for the proposed termination. 24 C.F.R. § 982.555(c)(2); *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970). ACOH's own policy also requires that the notice "includ[e] the regulatory reference." *See,* Section 8 Admin. Plan Chapter 16, p. 16-16, Exhibit 1.

24.    The PHA must offer an "informal hearing" in the termination notice where the voucher holder may present evidence relating to the individual circumstances of the family to an impartial decision-maker who determines if the PHA's decision is in accordance with the law, HUD regulations, and the PHA's policies. 24 C.F.R. § 982.555(a)(1)(iv); *see* Exhibit 1, p.16-14. ACOH has designated specific persons who are eligible to serve as hearing officers. *See* Exhibit 1, p. 16-18.

25.    The hearing officer must issue the decision in a written statement, explaining the reasons for the determination and the evidence relied on. 24 C.F.R. § 982.555(e)(6); *Goldberg*, 397 U.S. at 271. Due process requires that the decision be based solely on the legal rules and evidence presented at the hearing. *Goldberg*, 397 U.S. at 271.

26.     When rendering a decision, the hearing officer must consider whether "the reasons for the PHA's decision are factually stated in the [n]otice."  *See* Exhibit 1, p. 16-21; *see also* 24 C.F.R. § 982.555(e)(6).

27.     For discretionary grounds of termination, the hearing officer must also consider some individual circumstances particular to the case, including "the seriousness of the case, the . . . culpability of individual family members, . . . the disability of a family member, and the effects of . . . termination of assistance on other family members." 24 C.F.R. § 982.552(c)(2)(i); *see also Lipscomb v. Hous. Auth. of Cty. of Cook*, 45 N.E.3d 1138, 1147-48 (App. Ct. Ill. 2015) (explaining that without some consideration of individual circumstances, the distinction between mandatory and discretionary terminations becomes meaningless); *Carter v. Lynn Hous. Auth.*, 880 N.E.2d 778, 786-87 (Mass. 2008) (explaining that failure to indicate consideration of all circumstances or decision not to so exercise discretion renders termination invalid).

28.     Accordingly, a termination that is based on inadequate notice or a hearing decision that is not in accordance with the applicable laws violates the family's guarantee of due process of law, and the PHA must overturn it. 24 C.F.R § 982.555(f)(2).

## STATEMENT OF FACTS

29.     Plaintiff Antigone Grant has held a Section 8 Housing Choice Voucher, which she has been using to afford safe and suitable housing for her and her children, for approximately thirteen years.  Initially the HCV was a family reunification voucher that was later converted into a standard HCV.

30.     Ms. Grant has been estranged from her husband since she got the voucher because he is physically, sexually, and emotionally abusive.

31.     Even after she moved away into her own home, the abuse continued.  For example, in May of 2016, Ms. Grant's estranged husband threw her down a hill and, in public, physically assaulted her to the point where she needed crutches.

32.     On another occasion he threatened her life with a gun outside of her home where the children were present.

33.     On yet another occasion, he showed up at her job and threatened her with a gun at her car.

34.     Ms. Grant has seven children. She had six of the children with her estranged husband and has a pending custody dispute for all six of those children. She has one other child who lives with her full time.

35.     As a result of the abuse of her husband, Ms. Grant has been diagnosed with post-traumatic stress disorder ("PTSD").

36.     Also, as a result of his abuse of the children, her six oldest children have all been diagnosed with trauma-related disorders.

37.     As part of her treatment for PTSD and her abuse, Ms. Grant has case workers at both Region Ten (the local Community Services Board), Cynthia Follmer, and the Shelter for Help in Emergencies (a local domestic violence shelter), Robin Jackson.

38.     Ms. Follmer assists Ms. Grant by helping her maintain her schedule and obligations, referring her to resources in the community, and by giving her emotional support.

39.      Ms. Jackson assists Ms. Grant by providing domestic violence specific counseling, referring her to resources in the community, and by giving her emotional support.

40.     Because of her PTSD, Ms. Grant has difficulty managing her finances timely, engaging with the community, and understanding and meeting responsibilities without assistance.

Additionally, Ms. Grant has struggled to keep a job because she gets anxious when she is required to go out into the world, fearing her estranged husband could show up at any time.

41.     When Ms. Grant lived in Richmond, her estranged husband would often show up to her house unannounced and unwelcomed.

42.     On or about September 25, 2019, the Henrico County Juvenile and Domestic Relations Court awarded primary physical custody to Ms. Grant during the summers and every other weekend during the school year. The father, who lives in Maryland, was awarded primary physical custody during the school year and every other weekend in the summer. The court based its decision partly on Ms. Grant's financial instability.

43.     As part of his ongoing abuse, Ms. Grant's estranged husband has been trying to take full custody of the children and destroy Ms. Grant's housing stability.

44.     At a custody hearing Ms. Grant's estranged husband presented a video that he filmed of Ms. Grant's home after he broke into the home and trashed it.

45.     It is suspected that the tactics Ms. Grant's husband uses to destroy her housing stability also include stealing her mail and hacking her email in order to block her reception of important notifications and calling and emailing her housing providers to report erroneous violations.

46.     When Ms. Grant lived in Richmond, prior to her residence in Louisa County, her estranged husband called the PHA there, Virginia Housing Development Authority (VHDA), to report false housing violations, which VHDA disregarded because they knew of his abuse.

47.     Because of these incidents in Richmond, Ms. Grant moved to Louisa County.  At that time, her HCV was ported back to ACOH.

48.     Amanda Stevens is now Ms. Grant's voucher specialist and primary contact at ACOH.

49.     Upon information and belief, Ms. Stevens has been aware that Ms. Grant is a victim of domestic violence and suffers from PTSD.

50.     Ms. Grant and Ms. Stevens had a conversation about the ongoing abuse and Ms. Grant's PSTD before Ms. Grant ported her voucher back to ACOH.

51.     Ms. Stevens is responsible for scheduling and notifying Ms. Grant of recertification meetings, as well as generally administering her voucher.

52.     On November 22, 2019, ACOH sent Ms. Grant a recertification notice for December 2019.

53.     On December 9, 2019, Ms. Grant emailed Ms. Stevens asking her to call.

54.     Ms. Grant avers that this request was made because she was under an extreme amount of stress during that time in relation to her custody battle and cross protective orders and was worried she might be missing things that needed to be done.

55.     Ms. Stevens did not call Ms. Grant.

56.     During the months of December 2019 and January 2020, Ms. Grant had at least six or seven protective and cross-protective order hearings against her estranged husband in Maryland. Her estranged husband was the instigator for all but one of these hearings.

57.     She was also unable to see her children for the Christmas holiday as she was supposed to per the court order.

58.     As a result of both the high number of hearings and not being able to see her children, Ms. Grant's mental state was severely frazzled in December 2019 and January 2020, making it very hard for her to cope.

59.     On December 30, 2019, an anonymous individual sent an email to ACOH alleging that Ms. Grant was "abusing the housing voucher program" and that "permanent sole custody" had been granted to the father of six of her children. Email of December 30, Exhibit 2.

60.     Upon information and belief, the anonymous individual was Ms. Grant's estranged husband.

61.     On or about January 8, 2020, ACOH sent Ms. Grant a letter informing her of various things she needed to do by January 24, 2020 or her HCV would terminate effective February 29, 2020. Letter of January 8, 2020, Exhibit 3.

62.     First, because of allegations of money owed to VHDA, she was told to pay the alleged balance. *Id.*

63.     Second, because of the anonymous email, she was told she must provide school enrollment forms and custody documentation.  *Id.*

64.     On or about January 10, 2020, ACOH sent Ms. Grant a second recertification letter, which rescheduled her recertification appointment for January 29, 2020. The letter stated that Ms. Grant's HCV was scheduled to terminate on March 1, 2020, and if she wished to continue rental assistance, she must attend this meeting. Letter of January 10, 2020, Exhibit 4.

65.     On or about January 24, 2020, Ms. Grant emailed ACOH a copy of the repayment plan set up with VHDA.

66.     On or about January 24, 2020, ACOH sent Ms. Grant an email informing her that they also needed the other items referenced in the January 8 letter by 5 p.m. that day.

67.     On or about January 25, 2020, Ms. Grant emailed ACOH a copy of the custody order for one of her children.  Ms. Grant informed ACOH that the custody order for that child (T.F.W.) was the same order for all six children and the only order she had been provided.

68.     In that same email, Ms. Grant informed ACOH that the children were not removed from her custody, but rather that she shared physical custody with her estranged husband, and that she had appealed the custody order to the circuit court, with trial set for June 1, 2020.

69.     She further explained in great detail much of the abuse she has suffered at the hands of her estranged husband.

70.     On or about January 27, 2020, Ms. Stevens replied to Ms. Grant demanding the custody orders for the other children and stating that she would be removing T.F.W. from her housing case.  Email of January 27, Exhibit 5.

71.     Ms. Stevens also stated that she was granting Ms. Grant an extension until January 29, 2020, to provide the custody information and the school enrollments, "as a courtesy." *Id.*

72.     ACOH's response to Ms. Grant's abuse and potential protection under VAWA was "I am very sorry you are experiencing these personal problems," but that she still had to submit the required information.  *Id.*

73.     On or about January 30, 2020, ACOH indicated through email that they planned to terminate Ms. Grant's HCV effective February 29, 2020, "due to failure to comply with your Family Obligations . . . in submitting required documents." Email of January 30, Exhibit 6.

74.     On or about January 30, 2020, ACOH mailed Ms. Grant a separate termination notice (the "Termination Notice") that stated that her HCV would terminate on February 29, 2020, "since [she] ha[s] not responded to any of [the] letters [sent by their office in the last thirty days]." Termination Notice, Exhibit 7.

75.     The Termination Notice was not received by Ms. Grant until her counsel requested it to prepare for an informal hearing.

76.     United States Postal Service records show Ms. Grant did not receive the letter, which was ultimately mailed back to ACOH.

77.     With the help of Ms. Follmer, Ms. Grant requested an informal hearing to appeal the voucher termination.

78.     On March 10, 2020, Ms. Grant had an informal hearing.

79.     Present at the informal hearing were Ms. Grant; her attorney, Rachel McFarland; a law  student working on the case under the supervision of Ms. McFarland, Annie Czyzewski (Ms. McFarland and Ms. Czyzewski collectively forming Ms. Grant's "counsel"); Ms. Grant's case worker at the SHE Shelter, Robin Jackson; Ms. Grant's friend Yolanda Burgess, ACOH case worker, Amanda Stevens; attorney for Albermarle County, Susan Baumgartner;  and the hearing officer, Assistant Director of the Department of Social Services, Wanda Hoerman.

80.     Upon information and belief, Ms. Baumgartner is an attorney for Albemarle County, and represents ACOH and the Albemarle County Department of Social Services.

81.     At the informal hearing, Ms. Grant requested the following reasonable accommodations for her PTSD: (i) not terminating her voucher and rescheduling the recertification meeting with Ms. Grant's RegionTen case worker, Ms. Follmer, present at said meeting, (ii) holding all future meetings at Ms. Grant's home, and (iii) including Ms. Follmer on all communications between ACOH and Ms. Grant.

82.     Ms. Grant also submitted a VAWA form detailing her abuse and why the termination was connected to said abuse.

83.     Ms. Grant, through counsel, made arguments on the failure to state a reason on the termination notice, Fair Housing Act violations, and VAWA protections.

84.     Ms. Grant, Ms. Burgess, and Ms. Jackson testified to, among other things:

a. Her lack of intent to commit any program violations and specifically that she did not understand she had to report the alleged change because it was not final or permanent;

b. Her lack of intent to fail to attend her recertification hearings;

c. Her mental state and the chaos with court hearings around the time of the scheduled recertification meeting;

d. How the loss of her HCV would lead to a high risk of homelessness for her infant son (at the time ten months old), who lives with her full time.

e. The severe effects of her abusive estranged husband having partial custody of her children, speaking to the abuse her children suffer at his hands. Further demonstrating the risks to the children, Ms. Jackson, Ms. Grant's domestic violence shelter caseworker, testified that if Ms. Grant were to lose her housing, she would almost certainly lose the custody battle.

85.    Ms. Grant asked the hearing officer to consider not terminating her HCV until the custody battle was finalized, at which time Ms. Grant could report the permanent change in household composition if she did not receive full custody of her children and discuss a repayment agreement for any overpayment.

86.    Ms. Baumgartner cross-examined Ms. Grant.

87.    At the end of the hearing, Ms. Baumgartner informed Ms. Grant that she would be advising Ms. Hoerman, and Ms. Hoerman confirmed she wanted to meet with Ms. Baumgartner.

88.    On March 17, 2020, Ms. Hoerman announced that "the actions taken by the Albemarle County Housing Officer to terminate [Ms. Grant's] housing choice voucher were appropriate" based on the following violations: (i) failure to provide the requested information for

recertification and attend the recertification meeting, (ii) failure to provide the verification of the children's school enrollment and proof of custody, and (iii) failure to report changes in family composition.   Decision letter, Exhibit 8.

89.    The hearing decision did not fully address Ms. Grant's VAWA claims.  *See id.*

90.    The hearing decision also only brushed over Ms. Grant's reasonable accommodation requests and stated she had already been given extra time in January.  *Id.*

91.    The hearing decision made no findings of whether the violations were intentional or negligent or any findings regarding the many mitigating factors.  *Id.*

92.    On March 20, 2020, Ms. Grant's counsel sent a letter to ACOH requesting that, without regard to any other legal challenges, ACOH at a minimum delay any termination until the public health crisis surrounding the novel coronavirus subsides.

93.    On March 26, 2020, ACOH replied stating that they would not entertain any such request.

94.    On March 31, 2020, pursuant to 24 C.F.R. § 982.555(f) and ACOH's Administrative Plan, Ms. Grant's counsel sent an appeal letter to ACOH informing them that the hearing decision was contrary to law. Ms. Grant asked that her HCV be restored, and the reasonable accommodations requested be instituted. Demand letter, Exhibit 9.

95.    On April 8, 2020, the request to reinstate her voucher and put in place the reasonable accommodations requests was denied.  Denial letter, Exhibit 10.

96.    In April 2020, Ms. Grant paid her entire April rent, including the portion attributable to ACOH.

97.    In May 2020, Ms. Grant has paid more than two-thirds of her May rent, which includes a portion of ACOH's portion.

98.     As of the date of this filing, Ms. Grant's right to continued housing is in doubt and peril.

## CLAIMS FOR RELIEF

### COUNT I: Failure to Grant a Reasonable Accommodation in Violation of the Fair Housing Act (42 U.S.C. § 3601 *et seq.*)

99.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

100.     Section 804(f) of the Fair Housing Act makes it unlawful to discriminate against any person in the rental of a dwelling because of a disability. 42 U.S.C. § 3604(f).

101.     A person has a "handicap," or disability, under the Fair Housing Act if they suffer from "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1).

102.     Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

103.     A reasonable accommodation request can be submitted at any time, including at and after a judicial or administrative hearing.

104.     Once a reasonable accommodation request has been submitted to a PHA, the PHA must make the accommodation if it is reasonable. *See* 42 U.S.C. § 3604(f)(3)(B).

105.     If the PHA believes an accommodation is unreasonable, it has an affirmative duty to engage in an interactive process and explore alternative avenues for accommodation. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001); Joint Statement of the Department of Housing and Urban Development and the Department of Justice: Reasonable Accommodations under the Fair Housing Act, p. 7 (May 17, 2004).

106.    Ms. Grant has been diagnosed with PTSD. Due to this disorder, Ms. Grant has difficulty engaging with the community, and understanding and meeting responsibilities without assistance.  Ms. Grant's PTSD qualifies as a handicap as defined in the Fair Housing Act.

107.    At the hearing, Ms. Grant requested the following reasonable accommodations: not terminating her voucher, rescheduling the recertification meeting with Ms. Grant's RegionTen case worker, Ms. Follmer, present at said meeting, holding all future meetings at Ms. Grant's home, and including Ms. Follmer on all communications between ACOH and Ms. Grant.

108.    Ms. Grant is entitled to reasonable accommodation, as it would be necessary to afford her full enjoyment of the property. *See* 42 U.S.C. 3604(f)(3)(B).

109.    These reasonable accommodations are necessary to accommodate this disability.

110.    By refusing these requests, ACOH failed to meet its obligation to provide reasonable accommodations as required under the Fair Housing Act, to Ms. Grant's detriment and is thereby liable to her in damages.

111.    By not entering into an interactive process to explore alternative arrangements that could provide reasonable accommodation for Ms. Grant's disability, to Ms. Grant's detriment and is thereby liable to her in damages.

112.    By failing to overturn the termination of Ms. Grant's Section 8 Voucher, ACOH unlawfully discriminated against her under the Fair Housing Act to Ms. Grant's detriment through housing instability, increased rent payments, increased risk of losing custody of six of her children because of housing instability, emotional distress, and other harms to be proven at trial, and is thereby liable to her in damages.

**COUNT II: Violation of 42 U.S.C. § 1983 by Failure to Provide Procedural Due Process as Required by the Fourteenth Amendment**

113.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

114.    ACOH and its officials act under color of state law in their administration of a HCV program.

115.    Ms. Grant had a constitutionally protected property interest in retaining her HCV. ACOH cannot terminate her voucher unless in accordance with the Fourteenth Amendment's due process of law. *See Mathews*, 424 U.S. at 332.

116.    ACOH violated Ms. Grant's right to due process of law when it failed to overturn the termination of her HCV that was based on a woefully inadequate termination notice and a hearing decision that was not in accordance with the law for the following reasons:

        *a.    ACOH failed to provide Ms. Grant with sufficient notice*

117.    Due process requires ACOH to provide Ms. Grant with a timely and adequate notice that details the legal and factual bases for the proposed termination, including the regulatory reference. 24 C.F.R. § 982.555(c)(2); *Goldberg v. Kelly*, 397 U.S. at 268-69; *see also* Exhibit 1, p. 16-16.

118.    Additionally, even if a PHA has reason to believe a tenant already knows the alleged basis for the termination, it must still provide adequate, detailed notice, particularly where more than one potential ground for termination exists; "actual notice" does not cure the deficiencies in the notice sent by the PHA. *Burch v. Chicago Housing Authority*, 2015 WL 5734453 at *4 (Ill. App. 1 Dist.,2015).

119.    ACOH violated Ms. Grant's right to due process when it terminated her HCV based on the notice mailed to Ms. Grant on January 30, 2020, as it failed to include both the factual and legal bases for termination.

120.    This notice stated only that her HCV would terminate on February 29, 2020 "since [she] ha[s] not responded to any of [the] letters [sent by their office in the last thirty days]."  Exhibit 7.

121.    The notice fails to give factual specifications about which letters or program requirements it is referring to as required by due process. The notice also fails to cite the regulatory regulations as required by the Administrative Plan.  *See id.*

122.    Instead of stating the factual and legal bases for the termination, the notice refers back to previous communications sent to Ms. Grant regarding the information required to continue her assistance. The notice fails to indicate which communications or requirements are the basis for the proposed termination.  *See id.*

123.    In the thirty days prior to sending the termination notice, ACOH had been in contact with Ms. Grant at least five times claiming each time that she might have committed different program violations and that some of these violations may lead to termination of assistance.

124.    On or about January 8, 2020, ACOH indicated two potential grounds for termination.  Exhibit 3.

125.    First, ACOH indicated that Ms. Grant needed to pay off an alleged balance to a previous housing agency by January 24, 2020.  Second, ACOH indicated there may have been a program violation if the anonymous email alleging her children were not living with her was true and that she needed to provide court documentation of the custody of her children and their school enrollment information by January 24, 2020.  *See id.*

126.    On or about January 10, 2020, ACOH indicated a different potential ground for termination if not completed: failure to attend the scheduled recertification meeting on January 29, 2020.  Exhibit 4.

127.    On January 27, 2020, ACOH indicated two potential program violations, but did not state that either violation may lead to termination: (i) failure to report a change in household composition, and (ii) failure to provide the requested documentation, specifically the custody information and school enrollments for the other five children.  Exhibit 5.

128.    With respect to the failure to report a change in household composition, ACOH informed Ms. Grant that if the children subject to the joint custody order did not live with her fifty percent (50%) of the time, the children will be removed from her housing case.  *See id.*

129.    For the failure to provide the requested documents, ACOH refused to accept the custody order for T.F.W. as the documentation for the rest of the children. ACOH gave Ms. Grant a two-day extension, until January 29, 2020, to provide the documentation requested.  *See id.*

130.    On January 30, 2020, ACOH indicated through email that they planned to terminate Ms. Grant's HCV effective February 29, 2020, "due to failure to comply with your Family Obligations . . . in submitting required documents." The documents Ms. Grant allegedly failed to submit were the school enrollments for the children, custody paperwork, and documents for the Annual Recertification. The email does not cite the regulatory regulations as required by the Administrative Plan.  Exhibit 6.

131.    These communications suggest that there is more than one potential ground for termination, but no communication between ACOH and Ms. Grant references which is the actual basis for termination. Thus, simply referring to these communications is not sufficient notice for due process.

132.     Further, none of these communications was itself the Termination Notice, which was sent as yet another communication.

133.     The notices also had two different termination dates: February 29, 2020, and March 1, 2020, adding to confusion.

134.     Based on these various notices, a reasonable person would not understand of what violations she was accused or what the specific facts were relating to the alleged violations, and Ms. Grant herself did not understand.

135.     ACOH was required to include all bases for termination in the Termination Notice. ACOH failed to do this, and the Termination Notice merely stated that Ms. Grant had failed to reply to various communications sent over the course of the previous thirty days.  Under ACOH's own Administrative Policy, ACOH was also required to include the regulatory reference in the notice for each basis of termination.  ACOH failed to do this as well.

136.     Without more specific facts or the regulatory reference in the termination notice, ACOH prejudiced Ms. Grant in her ability to know the exact basis for termination and prepare and present defenses.

137.     When rendering a decision, the hearing officer must consider whether "the reasons for the PHA's decision are factually stated in the [n]otice." *See* Exhibit 1, p. 16-21.

138.     The hearing officer failed to consider that the notice did not include the factual reasons for the termination, as required by the Administrative Plan.

139.     Thus, ACOH violated Ms. Grant's right to due process when it terminated her HCV based on this notice and further when it refused to overturn the hearing officer's decision that was contrary to the law and the Administrative Plan both to Ms. Grant's detriment and is thereby liable to her in damages.

### b.    *The hearing officer had improper communications with other parties*

140.    In accordance with due process, the decision to overturn a PHA's termination of a HCV must be made by an impartial decision-maker. *Goldberg*, 397 U.S. at 271.

*141.*    The voucher holder has a right to hear every argument made for terminating her HCV, and thus, the decision must be based only on the legal rules and evidence presented at the hearing. *See* 24 C.F.R. § 982.555(e)(6); *Goldberg* 397 U.S. at 270-71.

142.    Ex-parte communications with the hearing officer violates the tenant's right to a hearing and for the decision to be based only on the legal rules and evidence presented at the hearing. *See Loving v. Brainerd Hous. & Redevelopment Auth.*, 2009 WL 294289 at *7 (D. Minn. Feb. 5, 2009).

143.    At the conclusion of the hearing, the hearing officer, Ms. Hoerman, scheduled a time to meet with Ms. Baumgartner to discuss the hearing, get advice on how to make a decision, and make said decision.

144.    Upon information and belief, Ms. Baumgartner is an attorney for Albemarle County, and represents ACOH and the Albemarle County Department of Social Services.

145.    It can be presumed that the advice the hearing officer requested from Ms. Baumgartner was on the legal rules and evidence presented at the hearing. As such, Ms. Grant had the right to hear the information provided.

146.    Upon information and belief, Ms. Baumgartner and Ms. Hoerman met to discuss the hearing and the outcome, Ms. Baumgartner advised Ms. Hoerman, and Ms. Hoerman relied on this information.

147.    Any discussions with the hearing officer outside of the hearing violates Ms. Grant's due process right to have the decision made by an impartial decision-maker based on only the legal

rules and evidence presented at the hearing to Ms. Grant's detriment, and ACOH is thereby liable to her in damages.

### c.    *The hearing officer failed to consider any mitigating factors*

148.    For discretionary terminations, the hearing officer must consider some circumstances particular to the case, including "the seriousness of the case, the . . . culpability of individual family members, . . . the disability of a family member, and the effects of . . . termination of assistance on other family members . . . ." 24 C.F.R. § 982.552(c)(2)(i).

149.    A violation of a family obligation is a discretionary ground for termination. 24 C.F.R. § 982.552(c)(1)(i).

150.    Based on ACOH's presentation of facts at the hearing and the hearing decision, it seems that the regulatory bases for the termination were (i) a violation of the family obligation to "supply any information requested . . . for use in a regularly scheduled reexamination," 24 C.F.R. § 982.551(b)(2); (ii) a violation of the family obligation to "supply any information that the PHA . . . determines is necessary in the administration of the program," 24 C.F.R. § 982.551(b)(1), specifically the verification of the children's school enrollment and proof of custody; and (iii) a violation of the family obligation to "promptly notify the PHA if any family member no longer resides in the unit,"  24 C.F.R. § 982.551(h)(3), specifically the change in the custody order that the children will be residing in the unit for less than fifty percent of the time.

151.    As these alleged violations would all be violations of family obligations for which termination is permissive but not mandatory, the hearing officer was required to consider some of the circumstances particular to Ms. Grant's case.

152.    Ms. Grant's testimony raised several mitigating circumstances particular to her case that the hearing officer failed to consider, including her disability (discussed *supra* in Count I), her

status as a domestic violence survivor (discussed *infra* in Count III), the lack of intent or maliciousness, the severity of the violations, and the effect termination would have on other family members.

153.    At the hearing, Ms. Grant argued that her failure to report a change in the household composition and her failure to attend the recertification meeting were neither intentional nor malicious.  Ms. Hoerman, however, did not make any finding regarding whether the violation was intentional or negligent.

154.    With respect to the failure to report a change in household composition, Ms. Grant presented evidence that ACOH's Interim Reporting Requirements insinuate that only the addition or permanent departure of a member of the household must be reported.  As she still had primary custody in the summers under the current custody order, and she was indeed appealing the custody order, Ms. Grant did not believe or understand that there was any obligation to report the possible change.  Thus, Ms. Grant's actions were not intentional or malicious.

155.    The hearing officer failed to consider that Ms. Grant lacked an intent to defraud ACOH when she failed to report a change in household composition in her decision.

156.    Terminating a Section 8 Voucher for a discretionary ground is a disproportionate penalty, specifically when it has serious consequences on the family's children, including an increased risk of homelessness. *See Paul v. N.Y.C. Hous. Auth.*, 932 N.Y.S.2d 477, 479 (N.Y. App. Div. 2011); *Gray v. Donovan*, 870 N.Y.S.2d 347, 348 (N.Y. App. Div. 2009).

157.    Ms. Grant testified that the loss of her HCV would lead to a high risk of homelessness for her infant son (at the time ten months old), who lives with her full time.

158.    Additionally, Ms. Grant testified about the severe effects of abusive estranged husband having partial custody of her children, speaking to the abuse her children suffer at his

hands. Further demonstrating the risks to the children, Ms. Jackson, Ms. Grant's domestic violence shelter caseworker, testified that if Ms. Grant were to lose her housing, she would almost certainly lose the custody battle.

159.    Ms. Grant asked the hearing officer to consider not terminating her HCV until the custody battle was finalized, at which time Ms. Grant could report the permanent change in household composition if she did not receive full custody of her children and discuss a repayment agreement for any overpayment.

160.    The hearing officer failed to consider any of these mitigating factors. Thus, the decision violated Ms. Grant's due process of law to her detriment through housing instability, increased rent payments, increased risk of losing custody of six of her children because of housing instability, emotional distress, and other harms to be proven at trial, and ACOH is liable to her in damages.

**COUNT III: Violation of 42 U.S.C. § 1983 and Procedural Due Process for Failure to Provide Protections Provided under the Violence Against Women Act (42 U.S.C. § 14043e-11)**

161.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

162.    Ms. Grant is eligible for VAWA protections because she has been a victim of felony and misdemeanor crimes of violence, sexual assault, and stalking by her current spouse. 42 U.S.C. § 14043e-11.

163.    HUD regulations prohibit a housing provider from terminating a tenant from a housing program if the basis for termination is "a direct result of the fact that the . . . tenant is or has been a victim of domestic violence."  24 C.F.R. § 5.2005(b)(1).

164.    The Violence Against Women Reauthorization Act of 2013 Guidance Document issued by HUD states that:

> [i]n addition to prohibiting a denial, termination, or eviction based on the fact that the applicant or tenant/participant is or has been a victim of domestic violence, dating violence, sexual assault or stalking, the VAWA Final Rule prohibits covered housing providers from denying assistance or admission, terminating participation in, or evicting a tenant based on an adverse factor, if the adverse factor is determined to be a direct result of the fact that the applicant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking.

Dep't of Hous. and Urban Dev, Notice PIH-2017-08, p. 6.

165.    The Guidance goes on to give examples of adverse factors, including things as seemingly tenuous as poor credit history and failure to pay rent. *Id.* at 7-8.

166.    ACOH's actions constitute an impermissible termination of Ms. Grant's program participation on the basis of her being a victim of domestic violence.

167.    Ms. Hoerman wrote in her decision letter that Ms. Grant's voucher was being terminated, in part, because there was a failure to report a change in family composition.  Exhibit 8.

168.    As discussed *infra*, Ms. Grant did not have a change in family composition, but upon information and belief, the information regarding the alleged change was brought to ACOH's attention by Ms. Grant's estranged, abusive husband, as a form of abuse.

169.    Ms. Grant's estranged husband has a history of providing anonymous, inaccurate "tips" to Ms. Grant's housing providers.

170.    Creating housing instability is a common form of domestic abuse.

171.    Despite this being brought to ACOH's attention during the hearing, ACOH still proceeded to terminate Ms. Grant's voucher in violation of VAWA protections.

172.     Additionally, to the extent there has been any change in Ms. Grant's family composition, the change is not final, as she has appealed the custody order to the circuit court.

173.     Under HUD Guidance[1], all anticipated family members must be counted in the family composition, including "children whose custody is being obtained by an adult family member."   U.S. Dep't of Hous. and Urban Dev. "HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs," p. 370, available at https://www.hud.gov/sites/documents/43503HSGH.PDF.

174.     Further, HUD regulations contemplate that a child who is temporarily out of the home because of placement in foster care should still be counted.  24 C.F.R. § 982.201(c); 24 C.F.R. § 5.403.

175.     Similarly, children who are temporarily out of the custody of a parent, but for whom the parent is attempting to regain custody, can be considered to fall into that same category as children in foster care, particularly when the parent has some custody awarded.  *See Smith v. Hamilton Cty.*, 2007-Ohio-1725, ¶ 29 (referencing the regulatory definition's inclusion of children in foster care to find that a mother whose children were in the primary custody of her parents while she tried to regain fully custody of them and who had custody herself for weekends, holidays, and summers was permitted to list her children as household members).

176.     Ms. Grant was granted partial custody of the children in the contested custody order.

177.     She appealed the custody order to the circuit court and is awaiting that hearing.

---

[1] Although this Guidance is specifically for multi-family housing, HUD is still in the process of creating guidance for housing choice vouchers, and the multi-family guidance is used in its place.

178.     Thus, she too is trying to regain full custody of her children, and they should be counted in her household.

179.     Further, the so-called change in Ms. Grant's family composition is regarding the amount of time that Ms. Grant's children reside with her and, importantly, is a direct result of the abuse from her estranged husband.

180.     The HUD Guidance document states, "On the surface, adverse factors may appear unrelated to domestic violence, dating violence, sexual assault, or stalking and may present legitimate reasons for denial, termination, or eviction. However, the presence of an adverse factor may be due to an underlying experience of domestic violence, dating violence, sexual assault, or stalking." *Id.*

181.     Though the adverse factors leading to her termination may not appear, on its face, to be a direct result of abuse, they are all a direct result of an underlying experience of abuse from Ms. Grant's estranged husband.

182.     As a part of his abuse and in order to further gain power and control over Ms. Grant, her estranged husband has been seeking full custody of her children.

183.     One tactic that he has successfully used to gain custody of her children, is breaking into her home, making a mess, and recording footage of the wreckage to argue she is an unfit mother.

184.     As a result of this abuse, under the current, but contested, custody order, six of Ms. Grant's children do not live with her at least fifty percent of the time.

185.     Therefore, the reason why Ms. Grant's family composition has temporarily changed is because her abusive, estranged husband has, through illegal and abusive methods, gained custody of her children.

186.     Ms. Hoerman, also noted that Ms. Grant's voucher will be terminated because she did not attend a reexamination meeting.

187.     Ms. Grant's failure to attend this meeting is a direct result of domestic abuse.

188.     Due to the abuse she has faced, Ms. Grant has PTSD, which makes it difficult for her to fully engage with reality and keep up with her obligations, like attending recertification meetings. As such, she has a case worker at RegionTen, Cynthia Follmer, to help her keep track of and comply with all that is required of her, like attending recertification meetings.

189.     Ms. Follmer was not notified of these recertification meetings and therefore was not able to give Ms. Grant the assistance she needs to attend these meetings.

190.      In addition, as a tactic of gaining power and control over Ms. Grant, her estranged husband has also engaged Ms. Grant in an extension series of protective order hearings.

191.     During the period when Ms. Stevens was scheduling the recertification meeting and requesting documents, Ms. Grant was required to attend court approximately six times in response to this predatory behavior of her abuser. Attending these court dates also made it difficult for Ms. Grant to attend the recertification meeting and submit all the paperwork requested in part due to her diminished mental state.

192.     In addition to those court hearings, instigated by her estranged husband, Ms. Grant also had to attend court approximately three times to enforce her visitation of her children, because he was not allowing her court-ordered visitation.

193.     In the list of examples provided by HUD, "job loss or lost wages due to missed work to attend court hearings, seek counseling or medical care, or deal with other consequences of the crime" may be an  explanation for failure to pay rent. *Id.* This example provides the guidance that a common ramification of domestic violence is court hearings and that attending these court

hearings can make it difficult for victims to comply with all housing obligations. Similarly, Ms. Grant was not able to comply with the housing obligation of attending a recertification meeting because she was attending court hearings related to her abuse.

194.    Because the termination was instigated by an email sent to ACOH as a form of abuse, ACOH's termination of her voucher is a direct result of abuse Ms. Grant has faced at the hands of her estranged husband, and thus ACOH's termination of Ms. Grant is contrary to VAWA to Ms. Grant's detriment, through housing instability, increased rent payments, increased risk of losing custody of six of her children because of housing instability, emotional distress, and other harms to be proven at trial, and ACOH is liable to her in damages.

### COUNT IV: Failure to Grant a Reasonable Accommodation in Violation of the Virginia Fair Housing Law (Va. Code § 36-96.1 *et seq.*)

195.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

196.    Section 36-96.3(A)(2) of the Virginia Code (the Virginia Fair Housing Law) makes it unlawful to discriminate against any person in the rental of a dwelling because of a disability.

197.    A person has a "handicap," or disability, under the Fair Housing Act if they suffer from "a physical or mental impairment which substantially limits one or more of such person's major life activities." Va. Code § 36-96.1:1.

198.    Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Va. Code § 36-96.3(B).

199.    A reasonable accommodation request can be submitted at any time, including at and after a judicial or administrative hearing.

200.    Once a reasonable accommodation request has been submitted to a PHA, the PHA must make the accommodation if it is reasonable. *See id.*

201.    If the PHA believes an accommodation is unreasonable, it has an affirmative duty to engage in an interactive process and explore alternative avenues for accommodation.  Va. Code § 36-96.3:2

202.    Ms. Grant has been diagnosed with PTSD. Due to this disorder, Ms. Grant has difficulty engaging with the community, and understanding and meeting responsibilities without assistance.  Ms. Grant's PTSD qualifies as a handicap as defined in the Fair Housing Act.

203.    At the hearing, Ms. Grant requested the following reasonable accommodations: not terminating her voucher, rescheduling the recertification meeting with Ms. Grant's RegionTen case worker, Ms. Follmer, present at said meeting, holding all future meetings at Ms. Grant's home, and including Ms. Follmer on all communications between ACOH and Ms. Grant.

204.    Ms. Grant is entitled to reasonable accommodation, as it would be necessary to afford her full enjoyment of the property. *See* Va. Code § 36-96.3(B).

205.    These reasonable accommodations are necessary to accommodate this disability.

206.    By refusing these requests, ACOH failed to meet its obligation to provide reasonable accommodations as required under the Fair Housing Act, to Ms. Grant's detriment, through housing instability, increased rent payments, increased risk of losing custody of six of her children because of housing instability, emotional distress, and other harms to be proven at trial, and is thereby liable to her in damages.

207.    By failing to overturn the termination of Ms. Grant's Section 8 Voucher, ACOH unlawfully discriminated against her under the Fair Housing Act to Ms. Grant's detriment through housing instability, increased rent payments, increased risk of losing custody of six of her children

because of housing instability, emotional distress, and other harms to be proven at trial, and is thereby liable to her in damages.

### COUNT V: Failure to Engage in an Interactive Process in Violation of the Virginia Fair Housing Law (Va. Code § 36-96.1 *et seq.*)

208.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

209.   Section 36-96.3(A)(2) of the Virginia Code (the Virginia Fair Housing Law) makes it unlawful to discriminate against any person in the rental of a dwelling because of a disability.

210.   A person has a "handicap," or disability, under the Fair Housing Act if they suffer from "a physical or mental impairment which substantially limits one or more of such person's major life activities." Va. Code § 36-96.1:1.

211.   Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Va. Code § 36-96.3(B).

212.   A reasonable accommodation request can be submitted at any time, including at and after a judicial or administrative hearing.

213.   Once a reasonable accommodation request has been submitted to a PHA, the PHA must make the accommodation if it is reasonable. *See id*.

214.   If the PHA believes an accommodation is unreasonable, it has an affirmative duty to engage in an interactive process and explore alternative avenues for accommodation. Va. Code § 36-96.3:2

215.   Ms. Grant has been diagnosed with PTSD. Due to this disorder, Ms. Grant has difficulty engaging with the community, and understanding and meeting responsibilities without assistance. Ms. Grant's PTSD qualifies as a handicap as defined in the Fair Housing Act.

216.    At the hearing, Ms. Grant requested the following reasonable accommodations: not terminating her voucher, rescheduling the recertification meeting with Ms. Grant's RegionTen case worker, Ms. Follmer, present at said meeting, holding all future meetings at Ms. Grant's home, and including Ms. Follmer on all communications between ACOH and Ms. Grant.

217.    Ms. Grant is entitled to reasonable accommodation, as it would be necessary to afford her full enjoyment of the property. *See* Va. Code § 36-96.3(B).

218.    These reasonable accommodations are necessary to accommodate this disability.

219.    ACOH was required to enter into an interactive process to find an alternative reasonable accommodation if they did not believe Ms. Grant's requests were reasonable.

220.    ACOH simply denied Ms. Grant's requests.

221.    By not entering into an interactive process to explore alternative arrangements that could provide reasonable accommodation for Ms. Grant's disability, to Ms. Grant's detriment and is thereby liable to her in damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

a.    Pursuant to 28 U.S.C. § 2201(a), a declaratory judgment against the Albemarle County Office of Housing declaring that "The Albemarle County Office of Housing discriminated against Ms. Antigone Grant and unjustly violated Ms. Grant's rights under the Fair Housing Act, under the Violence Against Women Act, and under Fourteenth Amendment Due Process, when it terminated her Section 8 Housing Voucher and refused to make reasonable accommodations for her protected disability."

b.    Injunctive relief under 42 U.S.C. § 3613(c)(1) and Va. Code § 36-96.18(C) against the Albemarle County Office of Housing requiring it to reinstate Ms. Grant's Section 8 Housing

Voucher immediately and grant Ms. Grant's reasonable accommodations to 1) reschedule the recertification meeting with Ms. Grant's RegionTen case worker, Ms. Follmer, present at the meeting; 2) hold all future meetings at Ms. Grant's home; and 3) include Ms. Follmer on all communications between ACOH and Ms. Grant;

      c.     Monetary damages to compensate Plaintiffs fully for any economic losses, degradation, embarrassment and emotional distress suffered due to Defendants' discriminatory and unconstitutional conduct, at an amount to be determined at trial, under to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(1), and Va. Code § 36-96.18(C);

      d.     Punitive damages, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(1) and Va. Code § 36-96.18(C);

      e.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and Va. Code § 36-96.18(C);

      f.     An award of such nominal, compensatory, consequential, special, and such other damages as may be appropriate; and

      g.     Any other such and further relief as the Court deems equitable and just in the circumstances.

**Trial by jury is demanded.**

Respectfully submitted this 25th day of May 2020,

                                        ANTIGONE GRANT

                                        By Counsel

                                        /s/ Rachel C. McFarland

                                        Rachel C. McFarland (VSB No. 89391)
                                        Caroline F. Klosko (VSB No. 78699)

Madeline Starbranch (VSB No. 89595)
Legal Aid Justice Center
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Tel. 434-977-0553
Fax. 434-977-0558

*Counsel for Plaintiff*